UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Wanda Duryea

    v.                                        Civil No. 15-cv-164-LM
                                                  Opinion No. 2017 DNH 078
MetroCast Cablevision of
New Hampshire, LLC, et al.


O R D E R

Wanda Duryea brings this lawsuit against her former employer, MetroCast Cablevision of New Hampshire, LLC, asserting claims for unlawful discrimination and harassment under RSA 354-A and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., as well as claims for retaliation under RSA 354-A:19, the ADA, and the Family and Medical Leave Act ("FMLA").[1] Before the court is defendants' motion for summary judgment on all counts. Duryea objects. For the reasons explained herein, the court grants defendants' motion for summary judgment on all claims except those alleging a hostile work environment.

---

[1] Duryea also sues Harron Entertainment Co. and Harron Communications, L.P., companies apparently associated with MetroCast Cablevision of New Hampshire, LLC. For simplicity, the court refers to the defendants, collectively, as "MetroCast."

## STANDARD OF REVIEW

A movant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the record, the court construes all facts and reasonable inferences in the light most favorable to the nonmovant. Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013). Summary judgment is inappropriate when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## BACKGROUND

On March 30, 2009, MetroCast hired Duryea as a Technical Service Representative in its Rochester, New Hampshire call center. Her job duties included providing phone, email, and chat support to MetroCast customers. Duryea worked at MetroCast for more than five years, until her termination on August 27, 2014.

Throughout her employment, Duryea suffered from a number of alleged disabilities, including bilateral tibial tendinitis (a condition that results in severe foot pain, especially when walking), asthma and emphysema, daily back pain, ear pain, vertigo, nausea, tinnitus, and loss of hearing. During her

employment at MetroCast, Duryea requested that MetroCast provide certain accommodations for her disabilities.  Duryea claims that as a result of her disabilities and accommodation requests she suffered discrimination and retaliation, culminating in her termination.  She also claims that supervisors and coworkers regularly harassed her because she was disabled.  The court summarizes her allegations chronologically.[2]

### Harassment in the Early Years of Duryea's Employment

In 2009, early in her tenure with MetroCast, Duryea experienced alleged harassment from a coworker who made inappropriate comments about her gender and her disabilities and from supervisors who made repetitive negative comments about her need to wear sneakers at work.

The incident involving a coworker occurred between June and August 2009.  The coworker, Casey Fontneau, harassed Duryea for being out sick and using a handicapped parking spot at work.  He made comments like "you don't look sick to me," "you don't look handicapped to me," and "those spots are for people in wheelchairs, you can walk."  Doc. no. 27-2 at ¶ 1.  Fontneau also made derogatory gender-based comments to Duryea about her

---

[2] The record in this case is quite lengthy.  The court recites here only those facts necessary to analyze Duryea's claims.  In so doing, the court construes the record in the light most favorable to Duryea, drawing all reasonable inferences in her favor.

"breast size" and "girly" selection of candy.  Id.  On August

13, 2009, Duryea reported Fontneau's harassment to MetroCast.

MetroCast investigated Duryea's complaint that same day and

issued Fontneau a written disciplinary notice.

The negative comments about Duryea's sneakers began in late

2009.  MetroCast's Employee Handbook required all employees at

the Rochester facility to wear "business casual" footwear.  Doc.

no. 23-7 at ¶ 8.  On November 22, 2009, Duryea requested

permission to wear sneakers at work due to her foot pain.  On

November 25, MetroCast granted Duryea's request.  Thereafter,

Duryea claims that several of her supervisors, including Bill

Schwartz, criticized her for wearing sneakers "on a weekly basis

. . . with 20 of those times being by Schwartz himself . . . ."

Doc. no. 27-2 at ¶ 5;  see also doc. no. 23-6 at 5 of 10 ("[A]t

least weekly . . . Bill Schwartz or another supervisor commented

that I was wearing sneakers and I had to tell them that I have a

doctor's note.").  Duryea testified at her deposition that the

negative comments continued for "[m]onths."  See doc. no. 23-3

at 27 of 91.  One of Duryea's former coworkers, Richard

Chojnacki, states in an affidavit that he

> overheard various supervisors including Jason
> Lamontagne, Roy Rudd, and Tony Graves tell [Duryea]
> repeatedly that she shouldn't be wearing sneakers at
> work, and I would hear Wanda respond that she had a
> doctor's note and that it was a work modification.
> But they continued to tell her she shouldn't be

> wearing sneakers.  I heard these comments at least
> eight times.

Doc. no. 27-4 at ¶ 6.  In February 2011, for reasons not clear from the record, Schwartz was terminated and Lamontagne became Duryea's supervisor.

### Issues at Work Following Duryea's Surgery

Beginning in 2011, following surgery on her right foot, Duryea alleges that she suffered numerous instances of harassment and discrimination.  The first such incident occurred on January 14, when Duryea returned to work after surgery in a wheelchair.  Upon her return, Schwartz sent her home, telling her that she could not return to work unless she had a note from her doctor.  Although Duryea obtained a doctor's note dated January 14 verifying that she could return to work using a wheelchair, see doc. no. 23-11 at 1 of 3, she remained out of work until January 20.

In addition to wearing sneakers, Duryea also used a scooter or walker at work, when needed, to lessen the pain from walking. Duryea alleges that, starting in 2011, she was harassed because of her scooter and walker use.  Lamontagne and Graves required her to keep the walker and scooter away from her desk so that they were not in the walkway.  Duryea says that walking from her desk to the scooter and walker caused her pain.  Duryea states that "[e]very time I had to use my scooter, from 2011-2014, Tony

Graves would say, 'You know, if you quit smoking, you would not need to use that scooter.'" Doc. no. 23-6 at 3 of 10. In her objection, Duryea appears to clarify that her use of the scooter "occurred approximately eight (8) times over three years." Doc. no. 27-1 at 4.

Finally, Duryea alleges that she experienced a further incident of harassment in January or February 2011 at a work-related dinner. Duryea, who was in a wheelchair at the time, spilled a drink on the floor during the dinner. Duryea's supervisor, Alex Laklas, told her to clean up the floor herself. Duryea "crawled out of the wheelchair onto the ground, and was watched by many people . . . ." Doc. no. 27-2 at ¶ 18. Laklas initially refused to let two coworkers help her clean, but he eventually allowed a coworker to assist her.

### Duryea's FMLA Leave and Her Raise and Bonus

In addition to the allegations of harassment and discrimination, Duryea also claims that MetroCast retaliated against her for taking FMLA leave. Specifically, Duryea alleges that MetroCast gave her lower raises and bonuses in 2011 and 2012 because she took FMLA leave in those years.

At the end of the calendar year, MetroCast gave each employee a raise and bonus based on the overall performance rating that employee received in her annual performance

evaluation.  MetroCast calculates an employee's overall performance rating by averaging the employee's scores in five different categories.  Those five categories have a total of 28 subcategories.  One of those 28 subcategories is entitled "Attendance, punctuality, time management" ("Attendance Category").[3]

In both 2011 and 2012, Duryea received the lowest possible rating, "Needs Improvement,"[4] in the Attendance Category.  In its comments in both years, MetroCast wrote that it "would like to see her attendance managed better."  See doc. no. 23-3 at 76 of 91, 81 of 91.  MetroCast explained in the comments that Duryea had used her allotted paid time off—vacation, personal, and sick days—well before the end of each calendar year.[5]  When Duryea received her 2012 evaluation, her supervisor told her that she received a lower rating in the Attendance Category "because of [her] absences."  Id. at 12 of 91.  Duryea claims that MetroCast retaliated against her by using her FMLA-protected leave, which

_____

[3] Beginning in 2013, MetroCast removed the Attendance Category from its annual performance evaluations.

[4] MetroCast defines "Needs Improvement" as "Consistently falls short of performance standards.  Performance has declined significantly, or employee has not sustained adequate improvement, as required, since the last performance review." See doc. no. 23-3 at 75 of 91.

[5] Duryea does not dispute that she exhausted her paid time off in both 2011 and 2012.

she took at various times in 2011 and 2012, to calculate her low ratings in the Attendance Category, thereby reducing her raises and bonuses in those years.

In 2011, although Duryea's overall performance rating was 2.7 out of 4, she received a raise (2.66%) higher than the company standard (2.5%) and received the highest bonus ($1,000) she was eligible to receive.[6]  In 2012, Duryea's overall performance rating was 2.8 out of 4, and she received a raise (2.8%) slightly lower than the company standard (3%) and received a bonus ($933) that was 93% of the highest bonus ($1,000) she could receive.  In December 2012, Duryea complained to her department manager that her FMLA-protected leave had affected her raise and bonus, but MetroCast did not change either her raise or bonus.

### Duryea's Request for a Parking Accommodation

Duryea alleges that, in November 2013, MetroCast discriminated against her by waiting 10 days before accommodating her request for a parking space closer to the employee entrance to the building.  Prior to 2013, MetroCast

---

[6] MetroCast does not explain how it determined the company standard raise.  MetroCast states that individual employee "[b]onuses and raises are calculated at the corporate level based upon the amounts budgeted by the company for annual raises and bonuses, and the overall performance rating given by the employee's supervisor."  Doc. no. 23-7 at ¶ 6.

permitted employees to enter the building through the main customer entrance, and Duryea had a designated handicap parking space near that entrance. By the fall of 2013, MetroCast had a new employee entrance and announced to employees that they could no longer enter the building through the main customer entrance and had to use the employee entrance. There were no handicap parking spaces located near the employee entrance.

On November 1, 2013, Duryea was experiencing increased foot pain and asked her department manager, Roy Rudd, if she could park closer to the employee entrance "during her overtime shifts." Doc. no. 27-2 at ¶ 23.[7] Rudd verbally denied her request. Duryea then informed her other supervisors that "she could not work her scheduled overtime" shifts because she "would have trouble walking from her car into the building." Id. at ¶ 24.

On November 4, Duryea gave MetroCast a note, signed by Dr. Nancy Stoll, requesting that she be allowed to park closer to the employee entrance for the next two weeks until she could evaluate Duryea and determine the extent of her disability. Dr. Stoll's note states:

> Please allow Wanda Duryea to park close to the
> employee entrance door over the next 2 weeks until she
> can make an appointment at our office to assess the

---

[7] It is unclear from the record why Duryea limited her request to overtime shifts.

9

extent of her disability. Unfortunately, as her covering provider for this practice, I am not able to confirm that Ms. Duryea is significantly disabled to require long-term accommodation regarding her parking situation at work.

Doc. no. 23-15.[8] MetroCast did not immediately provide Duryea with a closer parking space.

On November 5, Duryea left work and went to Barrington Urgent Care due to intense foot pain, which she claims was caused by additional walking at work. Duryea was seen by Dr. Stoll the next day, and Dr. Stoll faxed a note to MetroCast stating that Duryea "must be excused from work" until November 13. See doc. no. 23-16. The note also states:

She may return to [work] on Wednesday, 11/13/2013, under the following terms: accommodations to be made to allow Mrs. Duryea to park closer to the new employee entrance or provide a key for the front lobby of the building due to her chronic medical condition.

Id. MetroCast then sent Dr. Stoll an "ADA Certification Form" to substantiate the requested parking accommodation. See doc. no. 23-18 at 9-10 of 10.[9]

---

[8] Dr. Stoll was not Duryea's regular doctor but was filling in for her primary care physician.

[9] MetroCast uses a standard two-page form, which it refers to as an "ADA Certification Form," to substantiate a disabled employee's accommodation request. The employee's physician signs the form and describes any accommodations that would allow the employee to perform the essential functions of her job. See doc. no. 23-18 at 9-10 of 10.

On November 11, Dr. Stoll returned the form to MetroCast, confirming Duryea's need for the parking accommodation.  By letter dated November 11, MetroCast approved the accommodation request and provided Duryea with a parking space near the employee entrance.

### Duryea's Request for a Desk Accommodation

Duryea also claims that MetroCast discriminated against her by denying her a timely accommodation regarding the location of her desk.  On January 27, 2014, after Duryea returned to work from three weeks of FMLA leave, she discovered that MetroCast had moved her desk to the far end of the call center, away from the employee entrance.  Duryea told Lamontagne "that walking the extra distance to her new seat would be painful on her feet." Doc. no. 27-2 at ¶ 33.  Lamontagne did not offer to move her desk, but instead explained that Rudd had moved her desk so that new employees could be closer to Lamontagne for training purposes.

Duryea made a formal request for a desk accommodation after returning from a three-month-long medical leave on May 29, 2014. On that date, Duryea provided MetroCast with a note dated February 15, 2014, from Dr. Joseph Martinez of Wentworth Health Partners, stating that "her desk needs to be located as close to the entrance/exit as possible to limit the distance she is

required to walk."  Doc. no. 24-2.  That same day, MetroCast

faxed an ADA Certification Form to Wentworth Health Partners.

One day later, on May 30, MetroCast moved Duryea's desk as close

to the employee entrance as possible, pending receipt of the ADA

Certification Form.  On June 12, MetroCast received the

completed form and notified Duryea that her desk would continue

to be located as close to the employee entrance as possible.

### Assignment of Training Tasks Following Medical Leave

Duryea alleges that during roughly the same period in 2014

that she requested the parking and desk accommodations,

MetroCast also discriminated against her by giving her training

assignments upon her return from two separate medical leaves.

First, when Duryea returned to work after taking leave from

January 31 through February 11, 2014, she claims that MetroCast

assigned to her "tasks that trainee employees are assigned."

Doc. no. 23-6 at 6 of 10.  She had not been assigned such

trainee tasks in over three years.  Shortly thereafter, Duryea

took medical leave from February 13 through May 29, 2014, due to

ear pain, vertigo, and nausea.  Duryea claims that, upon her

return on May 30, MetroCast placed her on "training status" for

one week, until June 6.  Id.

## Termination of Duryea's Employment

On May 27, 2014, Duryea filed a charge of discrimination against MetroCast with the Equal Employment Opportunity Commission ("EEOC").  On June 10, 2014, MetroCast received notice of the complaint from the EEOC.

Duryea's health deteriorated in the summer of 2014, as she began to experience problems with vertigo and breathing.  On June 17, Duryea gave MetroCast a doctor's note indicating that she was being treated for vertigo and could work when she did not experience dizziness.  After receiving an ADA Certification Form from her physician, MetroCast granted Duryea an accommodation to take intermittent unpaid leave when needed because of her vertigo.

Then, in July 2014, Duryea experienced asthma and breathing difficulties unrelated to her vertigo.  On July 8, Duryea called out of work for breathing problems, and she was treated for bronchial asthma and chronic sinusitis.  Duryea's doctor indicated that she could return to work on July 28.

On July 22, 2014, MetroCast notified Duryea, that she had no remaining paid time off—vacation, personal, or sick days—for the year.  MetroCast informed Duryea that she would only be eligible to take additional time off for: (1) approved unpaid leave under the FMLA; (2) approved unpaid leave as a reasonable

accommodation under the ADA; or (3) leave that is specifically provided for in the Employee Handbook. MetroCast did not otherwise permit employees to take unpaid time off and remain employed.

On July 26, while still out of work, Duryea inquired about her remaining FMLA leave. MetroCast advised her that she was not eligible to take FMLA leave until November 2014. MetroCast explained, however, that if her asthma and breathing difficulties qualified as a disability, Duryea may be eligible for additional unpaid time off as an ADA accommodation. As such, MetroCast asked her to obtain an ADA Certification Form regarding her asthma and breathing difficulties.

On August 14, Duryea's primary care physician, Dr. Girish Joshi, sent MetroCast an ADA Certification Form indicating that Duryea, who remained out of work, had chronic obstructive pulmonary disease (COPD) and was not expected to improve. Dr. Joshi stated that Duryea could not perform the essential functions of her position as a Technical Service Representative because she had difficulty "with talking and breathing at work and is not able to talk for long periods on phone." Doc. no. 24-16. He did not indicate any reasonable accommodations that would allow her to return to work.

On August 26, MetroCast's Director of Human Resources, Joan McGlinn, spoke with Duryea to determine whether she agreed with Dr. Joshi that there was no accommodation that would allow her to return to work. Duryea said that she did not think she would ever be able to return to work.

On August 27, McGlinn sent Duryea a letter terminating her employment, which stated in part:

> In particular, your health care provider did not list any accommodation that the Company could provide to you, and also indicated that your condition was permanent. When you and I spoke yesterday, I asked you whether you agreed with your health care provider or whether you thought that there might be some accommodation that we could provide to you. In response, you did not disagree with your health care provider's position and indicated that you couldn't breathe and that you didn't think that you would ever be able to return to work.
>
> Since no accommodation has been identified to allow you to continue to work, the Company is hereby terminating your employment, effective today.

Doc. no. 24-17.[10]

### Duryea Files This Lawsuit

On December 15, 2014, Duryea amended her EEOC complaint to include her termination. On January 6, 2015, the EEOC issued Duryea a Notice of Right to Sue. On April 4, 2015, Duryea filed a complaint against MetroCast in state court, alleging claims

---

[10] There is no dispute that the Social Security Administration had declared Duryea totally disabled as of at least August 27, 2014.

for disability discrimination and harassment under RSA 354-A and the ADA (Counts I and III), retaliatory discharge under RSA 354-A:19 and the ADA (Counts II and IV), and retaliation under the FMLA (Count V). See doc. no. 1-1. MetroCast removed the case to this court and now moves for summary judgment.

## DISCUSSION

I. Disability Discrimination / Hostile Work Environment (Counts I and III)

In Counts I and III, Duryea asserts claims against MetroCast for disability discrimination and harassment under RSA 354-A and the ADA, respectively. She contends that she was discriminated against because of her disabilities and subjected to harassment that created a hostile work environment. The parties agree that the analysis of Duryea's claims is the same under RSA 354-A and the ADA; thus, the court relies on cases interpreting the ADA to assess both her state and federal claims. See Posteraro v. RBS Citizens, N.A., 159 F. Supp. 3d 277, 288 (D.N.H. 2016); Gallagher v. Unitil Serv. Corp., No. 14-cv-20-SM, 2015 WL 5521794, at *15 (D.N.H. Sept. 17, 2015); see also Madeja v. MPB Corp., 149 N.H. 371, 378 (2003) (relying on cases interpreting federal employment discrimination law to aid interpretation of RSA 354-A).

A. Hostile Work Environment

Duryea first claims that MetroCast employees, including supervisors, harassed her because of her disabilities.  To succeed on a hostile work environment claim based on disability harassment, an employee must show that (1) she was disabled, (2) she was subjected to a hostile environment, and (3) the hostility was directed at her because of her disability.  See Quiles-Quiles v. Henderson, 439 F.3d 1, 5 & n.1 (1st Cir. 2006). The employee must present evidence that the harassment was "sufficiently severe or pervasive so as to alter the conditions of [her] employment and create an abusive work environment." Ponte v. Steelcase Inc., 741 F.3d 310, 320 (1st Cir. 2014) (quoting Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 228 (1st Cir. 2007)).  MetroCast argues that the evidence of alleged harassment in this case is insufficient to constitute a hostile work environment.

While there is "no mathematically precise test to determine whether a plaintiff presented sufficient evidence that she was subjected to a severely or pervasively hostile work environment," Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006) (internal quotation marks and alteration omitted), she must show that her "workplace was permeated with discriminatory intimidation, ridicule, and insult that was

sufficiently severe or pervasive to alter the conditions of
[her] employment and create an abusive working environment."
Quiles-Quiles, 439 F.3d at 7 (alterations omitted) (quoting
Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  The
harassment must be "both objectively and subjectively offensive,
such that a reasonable person would find it hostile or abusive
and the victim in fact did perceive it to be so."  Ponte, 741
F.3d at 320 (quoting Forrest, 511 F.3d at 228).

Courts consider factors such as the "frequency of the
discriminatory conduct; its severity; whether it is physically
threatening or humiliating, or a mere offensive utterance; and
whether it unreasonably interferes with an employee's work
performance."  Noviello v. City of Boston, 398 F.3d 76, 92 (1st
Cir. 2005) (quoting Faragher v. City of Boca Raton, 524 U.S.
775, 787-88 (1998)).  "Case law is clear that simple teasing,
offhand comments, and isolated incidents (unless extremely
serious) will not amount to discriminatory changes in the terms
and conditions of employment to establish an objectively hostile
or abusive work environment."  Colón-Fontánez v. Municipality of
San Juan, 660 F.3d 17, 44 (1st Cir. 2011) (internal quotation
marks omitted).  The court must "distinguish between the
ordinary, if occasionally unpleasant, vicissitudes of the

workplace and actual harassment."  Id. (quoting Noviello, 398
F.3d at 92).

Here, Duryea points to numerous incidents of alleged
harassment, including the following:

- Fontneau's disparaging comments in 2009 about her
  disability and gender

- Repetitive comments from Duryea's supervisors from 2009-
  2011 about her sneakers, despite their awareness of her
  foot-related disability

- The incident at a work-related dinner in 2011 where she
  dropped a drink on the floor while in a wheelchair and a
  supervisor humiliated her in front of others by demanding
  that she clean up the floor by herself

- Graves's negative comments from 2011-2014 about Duryea's
  use of a scooter, despite his awareness that she used a
  scooter as an accommodation for her foot-related
  disability.

MetroCast argues, in passing, that Duryea's claims of
disability-based harassment are time barred.  However, construed
favorably to Duryea, her hostile work environment claim alleges
a continuing violation.  See Tobin v. Liberty Mut. Ins. Co., 553
F.3d 121, 130 (1st Cir. 2009) (a continuing violation "is
composed of a series of separate acts that collectively
constitute one 'unlawful employment practice'" (quoting Nat'l
R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002))); see
also Ayala v. Shinseki, 780 F.3d 52, 57 (1st Cir. 2015) ("Under
the 'continuing violation' doctrine, a plaintiff may obtain
recovery for discriminatory acts that otherwise would be time-

barred so long as a related act fell within the limitations period." (quoting Tobin, 553 F.3d at 130)); Johnson v. Univ. of P.R., 714 F.3d 48, 53 (1st Cir. 2013) ("Discrete acts and hostile work environment claims are 'different in kind,' because hostile work environment claims by their nature involve repeated conduct and a single act of harassment may not be actionable on its own." (internal citations omitted)). Construed in Duryea's favor, she has described a pattern of disability-related harassment that continued from 2009 through at least January 2014, when Graves made comments about her use of the scooter.

"As [the First Circuit has] observed, the hostile environment question is commonly one of degree—both as to severity and pervasiveness—to be resolved by the trier of fact on the basis of inferences drawn from a broad array of circumstantial and often conflicting evidence." Billings v. Town of Grafton, 515 F.3d 39, 50 (1st Cir. 2008) (internal quotation marks omitted). Here, based on the number of supervisor-initiated comments and incidents at issue, and the severity of the incident at the work-related dinner, the question of whether the alleged disability harassment was severe or pervasive enough to constitute a hostile work environment should be resolved by a jury. Accordingly, the court denies MetroCast's motion for summary judgment on Counts I and III with

respect to Duryea's hostile work environment claims based on disability harassment.[11]

B. Disability Discrimination

Duryea also claims that MetroCast discriminated against her because of her disabilities.  Her discrimination claim appears to assert two distinct theories of liability: (1) failure to accommodate her disabilities and (2) disparate treatment.  See Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002).  The court analyzes each claim in turn.

1. Reasonable Accommodation Claim

Employers are required to make "reasonable accommodations" for "the known physical or mental limitations" of an otherwise "qualified individual with a disability."  See 42 U.S.C. § 12112(b)(5)(A); RSA 354-A:7, VII(a).  An employee may bring a discrimination claim based on her employer's failure to reasonably accommodate her disability.  See, e.g., Lang v. Wal-Mart Stores East, L.P., 813 F.3d 447, 454 (1st Cir. 2016).  In order to survive a motion for summary judgment on a reasonable

---

[11] In Duryea's objection to MetroCast's summary judgment motion, she advances a constructive-discharge claim for the first time.  Duryea did not bring a claim for constructive discharge in her complaint, and she cannot amend the complaint through her objection.  See Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jiménez, 659 F.3d 42, 53 (1st Cir. 2011).

accommodation claim, the employee must produce enough evidence
for a reasonable jury to find that (1) she was disabled within
the meaning of the ADA; (2) she was an "otherwise qualified
individual," meaning she was able to perform the essential
functions of her job, either with or without a reasonable
accommodation; and (3) the defendant, despite knowing of the
employee's disability, did not reasonably accommodate it.  See
Valle-Arce v. P.R. Ports Auth., 651 F.3d 190, 198 (1st Cir.
2011); Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003).

Duryea claims that MetroCast failed to provide reasonable
accommodations in response to her requests for a parking space
and desk near the employee entrance.  Although MetroCast granted
both accommodations upon receiving disability paperwork from her
physicians, Duryea contends that MetroCast failed to provide the
accommodations within a reasonable period of time because of the
delay between her requests and MetroCast's approval.

Duryea provides no support for her argument that an
employer's delay while waiting for supporting medical
documentation constitutes a failure to provide a reasonable
accommodation, and neither RSA 354-A nor the ADA requires an
employer to grant accommodation requests within a certain number
of days.  Even viewing the facts most favorably to Duryea, no
reasonable jury could conclude that MetroCast's delay in

providing these accommodations constitutes disability
discrimination.  Accordingly, Duryea's claim that MetroCast
failed to reasonably accommodate her disabilities is
insufficient to get to a jury.

### 2. Disparate Treatment Claim

Duryea also alleges disability discrimination based on
disparate treatment.  To establish a prima facie case of
disability discrimination based on disparate treatment, an
employee must show "(1) that she was 'disabled' within the
meaning of the ADA; (2) that she was able to perform the
essential functions of her job with or without accommodation;
and (3) that she was discharged or adversely affected, in whole
or in part, because of her disability." Jones v. Walgreen Co.,
679 F.3d 9, 14 (1st Cir. 2012) (quoting Ruiz Rivera v. Pfizer
Pharms., LLC, 521 F.3d 76, 82 (1st Cir. 2008)).  If the
plaintiff establishes a prima facie case, then the employer must
articulate a legitimate, non-discriminatory reason for its
action, and, if the employer does so, the burden then shifts
back to the plaintiff to show that the employer's justification
is mere pretext.  See Tobin v. Liberty Mut. Ins. Co., 433 F.3d
100, 105 (1st Cir. 2005).

"An adverse employment action typically involves discrete
changes in the terms of employment, such as hiring, firing,

failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 314 (1st Cir. 2016) (internal quotation marks omitted). "To be adverse, an employment action must materially change the conditions of plaintiffs' employ." Cham v. Station Operators, Inc., 685 F.3d 87, 94 (1st Cir. 2012) (internal quotation marks omitted). The First Circuit has indicated that to constitute an adverse action, the employer must either

> (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsi- bilities, or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service.

Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996) (internal citations omitted). "[T]he mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." Id.

Duryea's argument regarding what constitutes an adverse employment action for purposes of this claim is less than clear. The only allegation that comes close to constituting an adverse action is her claim that MetroCast gave her a quasi-demotion by requiring her to complete assignments for employees in training

on two occasions after she returned to work following extended medical absences.[12]  Duryea argues that it "was insulting to be given training tasks after several years of employment."  Doc. no. 27-1 at 24.

Despite Duryea's characterization of the training assignments as a temporary demotion, MetroCast placed her on training status for only a limited period of time, and she did not lose status, wages, or benefits as a result.  No reasonable jury could conclude that placing Duryea on temporary training status was an adverse employment action related to her disabilities.  Moreover, even assuming Duryea could establish that placing her on temporary training status was an adverse action, she has presented no evidence that MetroCast's stated reason for this action was a pretext for discriminatory animus. Duryea does not allege that MetroCast treated other employees

---

[12] Duryea's complaint mentions a number of other incidents, but not one constitutes an adverse action based on her disabilities.  For example, Duryea argues that MetroCast discriminated against her by requiring her to obtain a doctor's note before allowing her to return to work in a wheelchair, causing her to miss several days of work.  But, Duryea was not terminated, demoted, or placed into any lesser employment status as a result of this incident.  Additionally, Duryea has failed to show that MetroCast would not have required other employees to obtain a doctor's note under the same or similar circumstances.

returning from extended leaves of absences any differently, and there is no evidence in the record that MetroCast treated Duryea differently because of her disabilities when it gave her the training assignments.  In fact, the record shows that MetroCast placed employees returning from extended leaves of absence, regardless of the reason for that leave, on temporary training status to become familiar with any new programs, policies, or procedures that went into effect while they were out of work. See doc. no. 23-4 at 2 of 4; doc. no. 23-5 at 3-4 of 4.

In sum, there is no genuine dispute of material fact as to whether MetroCast discriminated against Duryea on the basis of her disabilities.  Accordingly, MetroCast is entitled to summary judgment on Duryea's disparate treatment and failure to accommodate claims in Counts I and III.

II.  Retaliatory Discharge (Counts II and IV)

In Counts II and IV, Duryea asserts claims against MetroCast for retaliatory discharge under RSA 354-A:19 and the ADA, 42 U.S.C. § 12203, respectively.  Because the analysis is the same under RSA 354-A and the ADA, the court again relies on cases interpreting the ADA to assess both Duryea's state and federal retaliation claims.  See Madeja, 149 N.H. at 378. Duryea alleges that MetroCast terminated her employment because

she requested accommodations for her disabilities and filed a charge of discrimination with the EEOC.[13]

"A retaliation claim under the ADA is analyzed under the familiar burden-shifting framework drawn from cases arising under Title VII." Kelley, 707 F.3d at 115.  To make out a prima facie retaliation claim under the ADA, the plaintiff must show that "(1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action."  Id. (internal quotation marks omitted).  If the plaintiff makes a prima facie showing of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision.  Id.  Finally, if the defendant meets this burden, then the plaintiff "must show that the proffered legitimate reason is pretextual" and that the employment decision was "the result of the defendant's retaliatory animus."  Id. (internal quotations marks omitted).

_____

[13] In her objection to MetroCast's summary judgment motion, Duryea characterizes Counts II and IV as asserting claims for retaliatory discharge and retaliatory harassment.  Counts II and IV in Duryea's complaint clearly allege "retaliatory termination" based on Duryea's accommodation requests and EEOC complaint.  See doc. no. 1-1 at ¶ 60, 61, 68.  However, they do not allege retaliatory harassment.  While the complaint includes allegations concerning harassment, there is no indication that Counts II and IV are based on that conduct.  Duryea cannot amend the complaint through her objection.  See Juarbe-Jiménez, 659 F.3d at 53.

MetroCast does not dispute that Duryea engaged in protected conduct by requesting reasonable accommodations for her disabilities and filing an EEOC complaint.  Nor does it dispute that she experienced an adverse action when her employment was terminated.  Rather, MetroCast argues that Duryea's retaliation claim fails because the record contains insufficient evidence for a reasonable jury to conclude that she would not have been terminated but for the protected conduct, and, in any event, she cannot establish pretext.

A. Causal Connection

To establish causation, "the plaintiff must show a nexus between the protected conduct and the alleged retaliatory act." Colón-Fontánez, 660 F.3d at 37 (citations omitted).  Duryea makes no argument as to causation in her objection or surreply. The record contains no evidence suggesting that MetroCast harbored any retaliatory animus on the basis of either Duryea's requests for accommodations or her filing of the EEOC complaint.

Although Duryea does not argue causation, the court notes that temporal proximity alone can, in certain circumstances, establish causation.  See id. ("One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action." (internal quotation marks omitted)); DeCaire v. Mukasey, 530

F.3d 1, 19 (1st Cir. 2008) ("[O]ur law is that temporal proximity alone can suffice to meet the relatively light burden of establishing a prima facie case of retaliation." (internal quotation marks omitted)).  Here, MetroCast terminated Duryea's employment approximately two and one-half months after MetroCast received notice of the EEOC complaint.  Viewing the evidence in the light most favorable to Duryea, such temporal proximity could be sufficient to establish causation.  See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" (citations omitted)); Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 178 (1st Cir. 2015) (holding that "two-month gap between protected activity and a material adverse action is sufficiently short to establish a prima facie case of retaliation"); Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 15 (1st Cir. 2012) (holding that three-month gap between filing EEOC complaint and employer discipline was "close enough to suggest causation").  The court will presume that Duryea has established a prima facie case of retaliation.  As explained below, however, Duryea fails to show pretext.

B. <u>Legitimate Non-retaliatory Reason</u>

Duryea does not dispute that MetroCast articulated a legitimate, non-retaliatory reason for terminating Duryea's employment. On August 14, 2014, Dr. Joshi informed MetroCast that Duryea could not perform the essential functions of her job because she had COPD. Dr. Joshi stated that Duryea was not expected to improve, and he did not indicate any accommodations that would allow her to return to work. On August 26, MetroCast spoke with Duryea. Duryea did not disagree with Dr. Joshi's prognosis and indicated that she did not think she would ever be able to return to work. On August 27, MetroCast terminated Duryea's employment because she had exhausted her available leave time and could no longer perform the essential functions of her job, with or without a reasonable accommodation.

C. <u>Pretext</u>

Because MetroCast has articulated a legitimate, non-retaliatory reason for terminating Duryea's employment, Duryea must show that MetroCast's stated reason is mere pretext offered to disguise its retaliatory animus. In order to show pretext, Duryea must show both that MetroCast's reason for terminating her was false, and that MetroCast actually terminated her in retaliation for her accommodation requests and EEOC complaint.

See Lang, 813 F.3d at 457 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).  Temporal proximity alone is insufficient to meet her burden.  See, e.g., Planadeball, 793 F.3d at 179; Hubbard v. Tyco Integrated Cable Sys., Inc., 985 F. Supp. 2d 207, 234 (D.N.H. 2013).

Duryea does not argue that MetroCast's stated reason for terminating her employment was false, nor does she point to any evidence of pretext.  Duryea instead seems to suggest that MetroCast only requested an ADA Certification Form regarding her asthma and breathing difficulties so that MetroCast would have a reason to fire her.  No reasonable jury could come to such a conclusion.

As of August 2014, Duryea had exhausted her available paid and unpaid time off, including FMLA leave.  Duryea was not entitled to remain employed if she took additional unpaid time off.  MetroCast, however, attempted to provide Duryea with intermittent unpaid leave as an accommodation for her asthma and breathing difficulties, which would have allowed her to remain employed.

The uncontroverted evidence shows that MetroCast requested the ADA Certification Form not because it was looking for a reason to fire Duryea, but in an effort to accommodate her asthma and breathing difficulties so that she could take

additional unpaid time off and keep her job.  Despite
MetroCast's efforts, Dr. Joshi certified that no such accommo-
dation would allow Duryea to return to work.  The record
establishes that MetroCast only terminated Duryea's employment
after it learned that she could not return to work——and after
Duryea told MetroCast that she did not think she would ever be
able to return to work——with or without the accommodation of
additional unpaid leave.  Duryea has pointed to no evidence
suggesting that this was not the actual reason for her
termination.

Moreover, Duryea provides no evidence that MetroCast
harbored retaliatory animus on the basis of either her EEOC
complaint or accommodation requests.  In fact, MetroCast
actually granted every accommodation she requested.  See Soileau
v. Guilford of Maine, Inc., 105 F.3d 12, 17 (1st Cir. 1997)
("Evidence that an employer willingly granted an employee's
request for an accommodation, though by no means dispositive of
the matter, tends to militate against making an inference of
retaliation . . . ."); cf. Kelley, 707 F.3d at 117 (employer's
resistance and confrontation in response to employee's
accommodation requests was evidence of pretext).  Notably, in
July 2014, after receiving notice of her EEOC complaint,
MetroCast offered and granted Duryea intermittent leave as an

accommodation, which allowed her to miss work when she experienced vertigo symptoms.  The record shows that throughout Duryea's five years of employment, MetroCast routinely made an effort to accommodate her disabilities and allowed her to take time off when needed.

Duryea points to statements allegedly made by three supervisors that suggest those supervisors viewed her as "faking" her disabilities and "trying to not work."  See doc. no. 27-4 at ¶ 10.  Two of those supervisors were overheard saying that they "had decided to let Wanda go and that they needed to up come with an excuse to fire her."  Id. at ¶ 11.

There are several problems with Duryea's reliance upon these statements as support for her pretext argument.  First, there is no evidence that those supervisors played any role in Duryea's termination.  Second, there is no evidence suggesting either a temporal or causal relationship between the statements and Duryea's termination.  Indeed, Duryea provides no evidence as to when any of these statements were made.

 "A 'stray remark' is a statement that, while on its face appears to suggest bias, is not temporally or causally connected to the challenged employment decision and thus not probative of discriminatory animus."  Barry v. Moran, 661 F.3d 696, 707 (1st Cir. 2011).  "'[S]tray workplace remarks,' as well as statements

made either by nondecisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus."  Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002).  Comments are not probative of pretext when "they were made in a situation temporally remote from the date of the employment decision, or were not related to the employment decision in question, or were made by nondecisionmakers." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001) (internal quotation marks and alteration omitted).

Here, there is no evidence linking the comments by Duryea's supervisors to her ultimate termination in August 2014.  Thus, even assuming the comments suggest that certain supervisors harbored discriminatory animus toward her, Duryea fails to explain any temporal or causal connection between those undated comments and MetroCast's decision to terminate Duryea.  Although certain supervisors may have wanted to fire Duryea, there is no evidence in the record that those supervisors played any role in MetroCast's decision to terminate Duryea's employment.  See, e.g., Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000) ("Typically, statements made by one who neither makes nor influences [a] challenged personnel decision are not probative in an employment discrimination case."

(internal quotation marks omitted)); [Laurin v. Providence Hosp.,](#) [150 F.3d 52, 58 (1st Cir. 1998)](#) ("[S]tatements by decisionmakers unrelated to the decisional process itself normally are insufficient to establish discriminatory animus." (internal quotation marks omitted)).  Given the "compelling stated reason" for Duryea's termination, see [Rivera-Aponte v. Rest. Metropol #3, Inc.,](#) [338 F.3d 9, 12 (1st Cir. 2003)](#), the comments unrelated to her termination are insufficient to create a triable issue on pretext.

In sum, viewing the record in Duryea's favor, no reasonable jury could conclude that MetroCast's stated reason for her termination—that by her own admission she could not return to work due to her medical condition—was mere pretext, and that MetroCast actually terminated Duryea in retaliation for requesting accommodations and filing an EEOC complaint. Accordingly, MetroCast is entitled to summary judgment on Counts II and IV.

III. FMLA Retaliation (Count V)

In Count V, Duryea alleges that MetroCast retaliated against her for taking FMLA leave by counting FMLA-protected absences against her in calculating her annual raises and bonuses in 2011 and 2012.

"[T]he FMLA prohibits retaliation against employees who take FMLA leave." Pagán-Colón v. Walgreens of San Patricio, Inc., 697 F.3d 1, 8 (1st Cir. 2012). For example, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under 'no fault' attendance policies." Id. (quoting 29 C.F.R. § 825.220(c)). To make out a prima facie case of FMLA retaliation, an employee must show: "(1) she availed herself of a protected FMLA right; (2) she was adversely affected by an employment decision; and (3) there was a causal connection between her protected conduct and the adverse employment action." Carrero-Ojeda v. Autoridad de Energia Electrica, 755 F.3d 711, 719 (1st Cir. 2014) (internal quotation marks and alteration omitted).

Duryea alleges that MetroCast used her FMLA leave as a negative factor in calculating her raise and bonus. In both 2011 and 2012, MetroCast gave Duryea the lowest possible rating in the Attendance Category, which measured an employee's annual performance in terms of attendance, punctuality, and time management. Duryea claims that she received the low ratings because she took time off from work, including FMLA-protected absences. And, because the Attendance Category was one of 28 subcategories MetroCast used to calculate raises and bonuses,

Duryea claims that her raises and bonuses in 2011 and 2012 were lower than they otherwise would have been if she had not taken FMLA leave.  MetroCast argues that Duryea's FMLA claim is barred by the FMLA's statute of limitations.  The court agrees.

A person alleging a violation of the FMLA generally must bring her claim within two years from "the date of the last event constituting the alleged violation for which the action is brought."  29 U.S.C. § 2617(c)(1).  However, in the case of a willful violation of the FMLA, the statute of limitations is extended to three years.  29 U.S.C. § 2617(c)(2).  Duryea filed her complaint on April 4, 2015, more than three years after she received her 2011 raise and bonus, but only two years and four months after she received her 2012 raise and bonus.  Thus, while Duryea's 2011 claim is time barred, her 2012 claim would be within the three-year statute of limitations for a willful violation.  Duryea must therefore present evidence that MetroCast willfully retaliated against her in 2012 for taking FMLA leave.

Although the FMLA does not define "willful," the First Circuit has held that "in order to establish a willful violation of the FMLA, a plaintiff must show that 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'"  Hillstrom v. Best

Western TLC Hotel, 354 F.3d 27, 33 (1st Cir. 2003) (quoting
McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)).
There is no such evidence in the record here.

Duryea's 2012 performance evaluation indicates that her low
rating in the Attendance Category was based on poor management
of her paid time off, since she ran out of paid absences well
before the end of the calendar year.  The only evidence Duryea
points to even remotely suggesting that MetroCast considered her
unpaid FMLA leave as part of the evaluation is the single
comment from Duryea's supervisor that she lost points in the
Attendance Category because she had taken time off from work,
which Duryea argues may have included both her paid and unpaid
absences.  But to establish a willful violation of the FMLA,
Duryea must do more than speculate that MetroCast may have
considered FMLA leave as part of her rating in the Attendance
Category.  Duryea must show that MetroCast knew it would violate
the FMLA, or that MetroCast recklessly disregarded Duryea's FMLA
rights, when it gave Duryea her rating in the Attendance
Category and then used that rating as one of 28 subcategories to
calculate her raise and bonus.  She has presented no such
evidence.

In 2012, MetroCast gave Duryea a raise (2.8%) slightly
lower than the company standard (3%) and a bonus ($933) slightly

below the highest bonus ($1,000) for which she was eligible to receive.  No reasonable jury could find that MetroCast willfully violated Duryea's FMLA rights when it calculated her raise and bonus in 2012.

Therefore, Duryea's FMLA claim is barred by the two-year statute of limitations.  See 29 U.S.C. § 2617(c)(1). Accordingly, MetroCast is entitled to summary judgment on Count V.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (doc. no. 23) is denied as to Counts I and III with respect to Duryea's hostile work environment claims, and is otherwise granted.

The court's case manager will reschedule the trial, the final pretrial conference, and all other deadlines.  All pending motions in limine are denied without prejudice to the parties' right to file motions in limine relevant to Duryea's hostile work environment claims.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

April 21, 2017
cc:  Debra Weiss Ford, Esq.
     Leslie H. Johnson, Esq.
     K. Joshua Scott, Esq.
     Martha Van Oot, Esq.